4 August 21, 2014 No. 56

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

STEVEN BRADLEY WALKER,
*Petitioner on Review.*

(CC 091089; CA A142712; SC S060828)

En Banc

On review from the Court of Appeals.*

Argued and submitted November 7, 2013.

Erica Herb, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause for petitioner on review. With her on the brief was Peter Gartlan, Chief Defender.

Pamela Johnstone Walsh, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Anna M. Joyce, Solicitor General, and Ellen F. Rosenblum, Attorney General.

LINDER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____
 * Appeal from Clatsop County Circuit Court, Philip L. Nelson, Judge. 252 Or App 1, 285 P3d 751 (2012).

**LINDER, J.**

The issue in this case is what constitutes an "enterprise" within the meaning of the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO), ORS 166.715 - 166.735. Defendant was charged in Clatsop County with one count of racketeering, ORS 166.720(3), and one count of theft in the first degree, ORS 164.055.[1] The racketeering count, which required proof that defendant participated in an "enterprise" through a pattern of racketeering, was based on the charged theft offense and two uncharged offenses of theft in the second degree allegedly committed in another county. A jury found defendant guilty of both the racketeering and the first degree theft offenses. Defendant appealed his conviction for racketeering, arguing that there was insufficient evidence that he had participated in an enterprise and that the trial court therefore had erred in denying his motion for a judgment of acquittal on the that count. A divided panel of the Court of Appeals affirmed the conviction. *State v. Walker*, 252 Or App 1, 285 P3d 751 (2012). We granted review to determine the correct interpretation of ORS 166.720(3). For the reasons explained below, we affirm.

## I.  BACKGROUND

A.  *Facts*

The facts, as recounted by the witnesses at the trial, were not significantly disputed. In several significant respects, however, the parties did dispute what inferences could be drawn from the facts. Below, consistently with the familiar standard that we use in reviewing a denial of a motion for judgment of acquittal, we describe the facts in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994) (identifying applicable standard of review). More particularly, however, we draw all reasonable inferences in the state's favor as well. *Id.* (on denial of motion for judgment of acquittal, court gives state the benefit of all reasonable inferences that can be drawn from evidence).

On March 26, 2009, defendant and another person, Williams, traveled together—probably from the Portland

---

[1] The relevant statutory provisions are set out in the discussion, below.

area—to Seaside. Once in Seaside, they went to the local Safeway store. Each selected a grocery cart, and each then began to shop independently. Price, a loss prevention officer, noticed them as they entered and began following them. Price worked in plain clothes and typically walked around the store to detect and monitor shoplifting activity. He particularly looked for the selection of "high-dollar, high-theft items," which in the grocery store business include disposable diapers, infant formula, meat, seafood, and beer.

Because defendant and Williams went separate directions in the store, Price watched defendant while another security officer followed Williams. Price saw defendant go to the seafood section and select nine large bags of frozen shrimp. Defendant then proceeded to another aisle, where he pulled Safeway plastic bags from his pocket—the kind used to bag groceries at the register—and put the bags of shrimp into them. At one point, defendant noticed Price watching him, so Price moved to a position where he would be less visible to defendant. Meanwhile, Williams had gone through the store and had placed several boxes of Huggies diapers, Tide laundry detergent, beer, and several bags of frozen shrimp into his cart, as well.

Defendant then took his cart out of the store without paying. Price followed defendant into the parking lot and saw defendant put the shopping bags filled with shrimp into the backseat of a car. Price yelled out to defendant, identifying himself as a security officer, and defendant fled on foot. By then, Williams had approached the store exit with his own cart. He likewise had not paid for the items in his cart. Williams abandoned his cart full of merchandise and also left the scene.

The Safeway security officers called the Seaside police, who arrived as the security officers were recovering merchandise from the backseat of the car and putting it into grocery carts. Defendant had thrown the bags of shrimp atop disposable diapers, Tide laundry detergent, cold beer, more frozen shrimp, and beef jerky that were already in the backseat. The recovered merchandise filled two and a half grocery carts. The merchandise was returned to the

store, where it was run through a register to determine its total value, which was $804.11. The police then impounded the car. Shortly after that, the police located and arrested Williams, who was the registered owner of the vehicle. After Williams consented to a search of the car, the police opened the trunk and found more boxes of Huggies diapers, cases of beer, and bags of shrimp. The beer was still cold; the shrimp was still frozen. Those items, too, were returned to the Safeway store and run through the cash register. They were valued at $329.06.[2]

At some point while the police were impounding the car and interviewing Williams, defendant called 9-1-1 to inquire about Williams's whereabouts. Defendant claimed that he was calling from Portland, but the call was traced back to a hotel in Seaside, where police officers apprehended him soon afterwards. During the ensuing police interview, defendant admitted that he and Williams had traveled together to Seaside for the day. Defendant admitted, however, to taking "only eight bags of frozen shrimp," which he told the interviewing officer that he had intended to "consume *** on the beach." He denied knowing whether Williams had taken anything from the Seaside Safeway. When the police told defendant that the items returned to the Safeway from the car totaled, in combination, more than $1,000, defendant insisted that the total could not be more $750, stating that "he wasn't stupid" and more than $750 "would be a felony." Defendant did, however, admit to police

_____

[2] At trial, the parties disputed whether the jury should infer that the merchandise found in the trunk of Williams's car had been taken from the Seaside Safeway store on March 26, 2009; we describe the facts based on the inference that favors the state. The dispute on that point was a significant one. The state had alleged that the items taken on that date from the Seaside Safeway were worth more than $1,000; the items found in the trunk were necessary to arrive at that value. At trial, defendant argued to the jury that the items could have been taken from other stores and the state had not adequately established they were taken from that Safeway store on that date; thus, defendant urged the jury to acquit on the Theft I charge. The state argued the converse inference. The jury was instructed that, to find defendant guilty of Theft I, it had to find that the aggregate value of the items taken from the Seaside Safeway on March 26, 2009, exceeded $1,000. Subsequently, on the verdict form returned by the jury, the jury specifically so found. The Court of Appeals erroneously viewed the merchandise in the trunk as possible evidence of a separate fourth theft from an undetermined grocery store, rather than as a part of the March 26 theft from the Seaside Safeway. *Walker*, 252 Or App at 12 n 5. That error, however, played no part in the court's analysis.

that he and Williams had "been involved in these types of thefts in the Portland area" during "the last two months."

At trial, the state established two such prior thefts, which it presented for purposes of establishing a pattern of criminal activity as relevant to the racketeering charge. Those thefts were described by Glen Moule, an "organized retail crime investigator for Safeway stores in Oregon and southwest Washington." Moule investigates thefts committed by "professional theft groups," ones that "primarily *** steal large amounts of high dollar merchandise from Safeway stores for the purposes of resale." Safeway stores that experience such thefts provide Moule with reports and video surveillance recordings of the activity for his investigation and analysis.

At some point before the trial of this case, and as part of his investigative responsibilities, Moule had reviewed video and still photos that showed defendant and Williams twice stealing similar items from a Safeway store in Sandy, Oregon, on dates several weeks before the Seaside theft. The first of those thefts occurred February 8, 2009. On that date, defendant and Williams entered the Sandy Safeway store, and each selected an empty shopping cart. Defendant went to the back aisle to the display of frozen seafood and put six bags of frozen shrimp into his cart. As defendant finished doing that, Walker moved into the same area and also took bags of shrimp from the display. Defendant then moved to other aisles, where he put several boxes of Huggies diapers into his cart and four cases of beer onto the cart's lower shelf. Defendant then walked to yet another area of the store, took plastic bags from his pocket, and put the bags of frozen shrimp in them. Williams, who entered several of the same areas after defendant, likewise loaded his cart with boxes of Huggies diapers, Tide detergent, and beer. Defendant exited the doors near the Safeway deli without paying for the items; soon afterwards, Williams exited through the same doors, likewise without paying for the items. Based on the time notation on the video, the two were in the store for a total of about six minutes.

A second video recording showed defendant and Williams commit a substantially identical theft from the

same Safeway store in Sandy about two weeks later, on February 23, 2009. Again, each entered the store, each selected an empty cart, and each moved through the store filling his individual cart with Huggies diapers, Tide laundry detergent, and cases of beer. Each then left the store through the door near the deli section without paying for the items.

B.   *Procedural Posture*

As noted, defendant was charged with first-degree theft, based on the Seaside Safeway theft, and with racketeering, based on that theft and the two previous thefts at the Sandy Safeway. Also as noted, defendant moved for a judgment of acquittal on the racketeering charge, arguing that the evidence was insufficient to prove that, in committing the predicate thefts, he had participated in an "enterprise" within the meaning of ORS 166.720(3).

Both the trial court and the parties considered *State v. Cheek*, 100 Or App 501, 786 P2d 1305, *rev den*, 310 Or 121 (1990), to be controlling on the scope and meaning of the term "enterprise". In that case, the court held that an enterprise could be established by "proof of an on-going organization, however loose, that is distinct from the commission of separate criminal acts by an individual." *Cheek*, 100 Or App at 505. Relying on *Cheek*, defendant argued in this case that the state's evidence established, at most, that defendant and Williams "committed multiple crimes together." Defendant emphasized that the state's evidence showed only that the two entered the stores at about the same time; once inside, they did not interact or communicate. Moreover, no evidence showed that the items stolen were later sold or disposed of in any kind of systematic manner.

The state argued in response that defendant and Williams were "basically in the business of going out and stealing items together"; that they had a particular *modus operandi* in that they were stealing the same types of items every time and even stealing from the same store chain every time; and that they had been engaging in that conduct for at least two months. The state conceded that there

was no direct evidence that the items were being resold, but urged that a jury could infer that they were. The state summed up, arguing that this was not "just average Joes going out and committing a few crimes together"; defendant and Williams "knew how to work the system," had a "specific deal *** between the two of them" to do that, and went out and committed multiple thefts from multiple Safeways in pursuit of that objective.

The trial court began its ruling on the motion by noting that, at the outset of the trial, the court had "qualms" about the case and did not think that defendant's conduct amounted to racketeering. But by the conclusion of the state's evidence, the court saw the evidence as establishing "more than what average Joes do in the commission of two or more crimes." This case involved, in the trial court's view, two people who were targeting Safeway stores and taking merchandise for at least a couple of months on a regular basis, as evidenced by the circumstances of the proven thefts, along with defendant's own admission that he and Williams were committing other similar thefts in the Portland area during the two months preceding the Seaside Safeway theft. The trial court denied the motion for judgment of acquittal, reasoning that, under the "broad reading" given to the term "enterprise" in *Cheek*, the state's evidence "gets there." The case was submitted to the jury, which found defendant guilty of racketeering.

Defendant appealed, again arguing that the evidence was insufficient to show the existence of an enterprise as required for the charge of racketeering. On appeal, the parties essentially renewed the arguments that they had made to the trial court. Both parties relied significantly on the meaning of "enterprise" articulated in *Cheek*. Both parties also relied on federal cases interpreting and applying the federal Racketeer Influenced and Corrupt Organizations Act, 18 USC §§ 1961-1968 (RICO), on which Oregon's statute (as we later discuss) was modeled. *See* David B. Frohnmayer, Donald C. Arnold and H. Robert Hamilton, "RICO: Oregon's Message to Organized Crime," 18 Will L Rev 1 n 2 (1982).

As noted, a divided panel of the Court of Appeals affirmed. The majority first explained that it did not aim to

revisit the meaning of the term "enterprise" that the court previously had announced in *Cheek*—*viz.*, for the purposes of ORICO, an entity must "partake of 'an ongoing organization, however loose, that is distinct from the commission of separate criminal acts' by the defendant." *Walker*, 252 Or App at 9-10 (quoting *Cheek*, 100 Or App at 505). Rather, the majority considered only whether the evidence in this case was sufficient to permit a jury to infer the existence of an enterprise as so defined. *Id.* at 10. The majority highlighted four "concerns" that were relevant to that inquiry: First, by referring to an "organization, however loose," the *Cheek* formulation is "very broad"; second, the "transcendent consideration" is ORICO's focus on "criminal activity that originates from a sense of organization"; third, there is often a symbiotic relationship between proof of an "enterprise" and proof of a "pattern of racketeering activity"; and fourth, although proof of one does not necessarily establish the other, it may do so in some cases. *Id.* at 10-12.

Turning to this case, the majority concluded that there was sufficient evidence of an organization, including the facts that defendant and Williams entered the stores together, stole the same items, and traveled together to the third theft; that is, in carrying out the three identified thefts, they followed a "choreographed course of action" in "coordinated concert." *Id.* at 12-13. The majority further concluded that, based on those same circumstances and the fact that they occurred over a two-month period, there also was sufficient evidence that the organization had the requisite "ongoing" continuity. *Id.* at 13. The majority expressly rejected defendant's argument that there was no evidence of an entity that was separate and distinct from defendant and Williams themselves; the majority reasoned that, even though defendant and Williams were the sole participants in the "informal partnership" enterprise, a collective is qualitatively distinct from its individual members. *Id.* For all of those reasons, the majority concluded that defendant's and Williams's "informal partnership" constituted an "enterprise" within the meaning of ORICO. *Id.*

Judge Edmonds dissented. He acknowledged that an informal partnership for the purpose of committing

multiple crimes could fall within ORICO's definition of an enterprise. In his view, however, although defendant acted in concert with Williams, using the same *modus operandi* on three occasions, those activities were "*ad hoc* or episodic" in nature; accordingly, in the dissent's view, the evidence did not permit an inference that the activities were attributable to an organization that was "distinct from the commission of the predicate crimes." *Id.* at 14-15 (Edmonds, S. J., dissenting).

We allowed defendant's petition for review. On review, tacitly recognizing that this court is not bound by the Court of Appeals' holding in *Cheek*, the parties expand on the positions that they took in the trial court and the Court of Appeals. Both defendant and the state look to the statutory text, context, and legislative history to argue their respective positions about the meaning of the term "enterprise." Both parties also look to federal cases for guidance. Ultimately, defendant and the state agree that an enterprise need not have a particular formal or legal structure, but rather can be comprised of individuals associated in fact, whose association is characterized by an ascertainable structure, some common purpose, and longevity sufficient for pursuit of the enterprise's purpose. Where they differ is on whether the enterprise must have continuity independent of its individual members and on what degree of formality is required for the enterprise's structure. We describe and analyze the parties' arguments at greater length in the course of our analysis below.

## II.   ANALYSIS

The interpretative issue for us is: What did the legislature intend the term "enterprise," as used in ORICO, to encompass? We resolve that issue through our usual method of statutory interpretation. We begin with the text and context of the statute, which are the best indications of the legislature's intent. If appropriate, we also consider the statute's legislative history. Finally, if the statute's meaning remains unclear, we may resort to general maxims of statutory construction. *See State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (explaining methodology).

A.   *Text and Context*

ORS 166.720(3) provides:

> "It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt."

The legislature did not define enterprise, but, in ORS 166.715(2), it did give an illustrative list of what the term includes:

> "'Enterprise' includes any individual, sole proprietorship, partnership, corporation, business trust or other profit or nonprofit legal entity, and includes any union, association or group of individuals associated in fact although not a legal entity, and both illicit and licit enterprises and governmental and non-governmental entities."[3]

Because the term "enterprise" is not otherwise defined, we also consider its ordinary meaning. *See generally State v. Kurtz*, 350 Or 65, 72, 249 P3d 1271 (2011) (fact that statute listed types of persons "include[d]" within "categorical term" at issue indicated that term "can embrace persons beyond those that the statute expressly lists"; court therefore considered ordinary meaning of term). In 1981, when ORICO was enacted, the ordinary meaning of the term "enterprise" was

> "**1 a :** a plan or design for a venture or undertaking <his friends judged his novel ~ to be impractical and urged him to forget it> **b :** VENTURE, UNDERTAKING, PROJECT; *esp* **:** an undertaking that is difficult, complicated or has a strong element of risk *** **c :** a unit of economic organization or activity (as a factory, a farm, a mine); *esp* **:** a business organization **:** FIRM, COMPANY *** **d :** any systematic purposeful activity or type of activity <agriculture is the principle economic ~ among these people> ***."

*Webster's Third New Int'l Dictionary* 757 (unabridged ed 1976).[4]

---

[3]  The quoted text of ORS 166.715(2) is identical to that originally passed by the 1981 Legislative Assembly.

[4]  Defendant notes that *Black's Law Dictionary* (6th ed 1990) defines "enterprise" as a "business venture or undertaking" and states that, under the federal racketeering statute, an enterprise "must be an ongoing organization, and

From the statutory text and the dictionary definition of enterprise, defendant argues that "the plain and ordinary meaning of the term enterprise demonstrates that it applies to organizations that engage in planned, systematic, and purposeful activity." And because the title of the act contains the term "organization," defendant argues, quoting *Webster's*, that enterprise contextually refers to "something organized *** a group of people that has a more or less constant membership, a body of officers, a purpose, and usu[ally] a set of regulations." *Webster's* at 1590. Defendant acknowledges that, in setting out a list of the entities that are "included[d]" within the term "enterprise", ORS 166.715(2) refers not only to legally cognizable entities such as partnerships and corporations, but also to groups of individuals "associated in fact." He nevertheless argues that, under the principle of *noscitur a sociis*,[5] individuals "associated in fact" must have the same characteristics as entities such as partnerships or corporations—*viz.*, a formal organization with an ascertainable structure, a continuing existence independent of individual members, and engagement in purposeful and systematic activity.

We agree with the state, however, that neither the statutory text or the ordinary meaning of the term "enterprise" requires the formality of structure or separate structural existence that defendant urges. Under ORS 166.715(2), an enterprise must be some kind of entity that can either employ or be associated with a person. Also, an enterprise must be something that an individual can conduct or participate in through a pattern of racketeering activity.[6] That

---

an entity separate from the pattern of activity in which it engages." The edition of *Black's* that was extant when the Oregon legislature enacted ORICO, however, defined the term "enterprise" as a "venture or undertaking[,] especially one involving financial commitment[,]" and did not include any reference to the federal racketeering statute. *Black's Law Dictionary* 476 (5th ed 1979).

[5] *Noscitur a sociis* "is an old maxim which summarizes the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated." *Nunner v. Erickson,* 151 Or 575, 609, 51 P2d 839 (1935) (quoting 2 *Williston on Contracts* § 618, 1999 (1st ed 1920)).

[6] ORS 166.715(4) defines "pattern of racketeering activity":

"'Pattern of racketeering activity' means engaging in at least two incidents of racketeering activity that have the same or similar intents, results, accomplices, victims or methods of commission or otherwise are interrelated by distinguishing characteristics, including a nexus to the same enterprise,

does not tell us a lot, but it does tell us that an enterprise has some kind of recognizable or ascertainable existence. Beyond that, the statute does not convey that the enterprise must exist separately from its associates, as opposed to existing as a result of the association itself. And, although an enterprise capable of employing a person ordinarily might have organizational formality of some kind, that is not invariably so. Moreover, no such formality is implied by the idea that an enterprise be capable of "associating" with a person.

The list of illustrative forms of enterprises in ORS 166.715(2) reinforces the conclusion that an enterprise need not be an entity or unit of any particular form or structure. The breadth of what qualifies as an enterprise is suggested, first, by the fact that the term expressly includes "any" form of the listed entities, thus conveying that the meaning of enterprise is both unrestricted and comprehensive.[7] The illustrative examples that follow convey the same thing. Enterprise includes: single individuals as well as associations of individuals; legal associations as well as associations-in-fact; individual legal formations (sole proprietorships) as well as group legal formations (partnerships, corporations, unions); for-profit as well as nonprofit associations; licit as well as illicit enterprises; and governmental as well as non-governmental entities.

The inclusion of "associations in fact" in the list in particular undermines defendant's argument that an enterprise must have a more formal structure and an existence apart from the individuals who comprise the enterprise itself. So, too, does the fact that an enterprise can be an individual. The legislature's choice to include those examples, along with others that have a more formal organization or an existence separate from their membership, was a way to broaden the meaning of enterprise, not narrow it.

---

and are not isolated incidents, provided at least one of such incidents occurred after November 1, 1981, and that the last of such incidents occurred within five years after an incident of racketeering activity."

[7] *See Dickinson v. Leer*, 255 Or 274, 276-77, 465 P2d 885 (1970) ("any," as used in statute related to service of summons, is unrestricted and comprehensive); *Reed v. Reed*, 215 Or 91, 96, 332 P2d 1049 (1958) ("any" used in statutory phrase conveys comprehensive meaning).

Our examination of the text of the ORICO statutes, together with the ordinary meaning of the term "enterprise", thus takes us to an expansive understanding of what an enterprise can be for purposes of a charge of racketeering. It can be any type of organization or entity, even a loosely formed or organized one, formed to carry out some purposeful venture, undertaking, or activity. It can be formal and have an independent legal existence. But it need not be. It can be informal as well, and it can derive its existence from the purposeful association itself. *See also* ORS 166.735(2) (provisions of ORICO "shall be liberally construed to effectuate its remedial purposes"). The statute requires no more, at least not as a matter of plain text and context.

B. *Legislative History*

As noted, defendant further relies on the legislative history of ORICO to argue that the legislature intended a narrower concept. If, in fact, the legislative history reveals that the legislature had a narrower understanding of the term in mind, and if that narrower meaning is consistent with the text, even if not compelled by it, the legislative history would be a basis on which we appropriately may construe the text more narrowly. *See Gaines*, 346 Or at 172-73 (when text of statute is capable of only one meaning, legislative history cannot support different interpretation; legislative history, however, can resolve ambiguity or demonstrate that superficially plain text is not so clear).

Our review of that history reveals that the bill's sponsors were concerned primarily with the presence and possible future expansion in Oregon of large-scale, organized crime consortiums engaged in prostitution, drug trafficking, and the like. *See, e.g.*, Testimony, Senate Committee on Justice, Joint Subcommittee on Organized Crime, SB 531, Apr 23, 1981, Ex A (statement of Oregon Attorney General Dave Frohnmayer). One witness—a member of law enforcement—also mentioned "frauds that cause businesses to go bankrupt and the elderly to lose their life savings" and "groups specializing in violence and theft." Testimony, Senate Committee on Justice, SB 531, May 18, 1981, Ex B (statement of Multnomah County Sheriff's Deputy Neil Crannell). Nevertheless, in response to a question from a

legislator about whether the statute might apply to shoplifting, that same witness acknowledged that it could, noting that some shoplifting "groups" take high-value items and "fence" them according to specific methods. Tape Recording, Senate Committee on Justice, SB 531, May 18, 1981, Tape 186, Side A (statement of Multnomah County Sheriff's Deputy Neil Crannell).

The key feature of the legislation was that it focused on the patterned character of crimes, rather than, as the law traditionally had done, on crimes committed as a single act on a single day by a single person acting alone. As Professor Blakey,[8] who presented the bill along with then Attorney General Frohnmayer, explained of federal RICO:

> "Traditionally we have thought of crimes as a single incident on a single day and a single person engaged in it. For most crimes, street crimes, that is the whole story[.] [B]ut for organized crime the important things are the things that are not included in the current code. That is the relationship between this crime this day and this crime[] the next day. That is, this crime is part of a pattern. Almost as important as its being part of a pattern is that there is an organization involved. The statute calls it an enterprise. *** What RICO does is look to the organized character of the crime and makes that an element of the offense and it looks to the patterned character of the criminal behavior and makes than an element of the [offense][.] [It] imposes on the government [the burden] of proving those elements and once those elements are proven it then warrants the treatment of that crime in a different fashion."

Minutes, Senate Committee on Justice, Joint Subcommittee on Organized Crime, SB 531, Apr 23, 1981, 6 (statement of Professor Blakey). In short, while large-scale organized crime was the target, nothing in the federal RICO statute made large- versus small-scale an element. Rather, the statute turned on the multiplicity of crimes and the "organized character" of those crimes, which together suggested that some form of organization was behind their commission. In

---

[8] Blakey, a professor at Notre Dame Law School, was more than just an interested academic. He had drafted the federal RICO act, was a nationally recognized expert on RICO, and had helped draft parallel state legislation in Arizona and Florida. Minutes, Senate Committee on Justice, Joint Subcommittee on Organized Crime, SB 531, Apr 23, 1981, 1.

light of Blakey's testimony about the purpose and design of the federal RICO statute, the legislators enacting the parallel provisions of ORICO would have understood the purpose and design of our statute to be similar.

Opponents of the bill also testified. One of them maintained that organized crime was not then a major problem in Oregon and that, to the extent it may become a problem, the portions of the bill establishing civil penalties such as forfeiture and injunctive relief, to be administered by the office of the Attorney General, were the most appropriate remedies. That witness opposed creating new criminal penalties for the commission of multiple crimes—particularly "low level" crimes—arguing that such patterns of criminal activity were most appropriately addressed by use of existing criminal-conspiracy and habitual-criminal statutes. Tape Recording, Senate Committee on Justice, SB 531, May 18, 1981, Tape 185, Side A (statement of Metropolitan Public Defender Jim Henning). A legislator, Senator Wyers, asked the witness if he had any suggestions to make it clear that the bill was not intended to "take two misdemeanors or Class C felonies *** and make them into a Class A felony." The witness responded that, although he did not believe it was the legislature's intent to apply the new statute to "a group of 20-year-olds who go out and shoplift a couple of times," it would be difficult to draft the bill to avoid that result. *Id.* Senator Wyers agreed that that result was "there in the language"; he understood that, although the Attorney General did not anticipate using the statute in that way, it would be within the discretion of Oregon's 36 district attorneys whether to do so. *Id.* Another witness from the criminal defense bar also testified that there was no current need for such a statute in Oregon and urged that, even assuming there was a need, it could be adequately addressed in the federal courts under the federal RICO statute, as well as by existing Oregon criminal statutes. *Id.* (statement of John Henry Hingson III).

In a legislative hearing the next day, Senator Wyers reemphasized the breadth of the proposed statute. He explained to his fellow legislators that a "group of three or four amateurs *** committing a series of burglaries or

shoplifts could fit under this act" and that he would consider it a "real mess" if the act were used against "low-level criminals"; he noted that the Attorney General did not intend for it to be used that way, but that Oregon's district attorneys nevertheless had discretion to do so. Tape Recording, Senate Subcommittee on Justice, SB 531, May 19, 1981, Tape 192, Side A (statement of Senator Wyers). In the floor debate preceding passage of the bill in the Senate, Senator Wyers gave examples of the kinds of conduct that the bill was intended to apply to, including contract killings by a motorcycle gang or a major organized crime entity; groups of a dozen or more persons involved in crimes yielding a "large sum of cash, hidden"; and such white-collar crimes as pharmacies submitting fraudulent billings to state agencies. Tape Recording, Senate Floor Debate, SB 531, May 28, 1981, Tape 95, Side A (statement of Senator Wyers). Senator Wyers emphasized the benefits of the civil penalties provided in the bill and noted that the Attorney General had agreed to consult with district attorneys about the proper application of the new criminal provisions. *Id*. at Tape 96, Side A.

The legislative history provides two insights that are helpful to us in interpreting the meaning of the term "enterprise". First, nothing in that legislative history suggests that the legislature intended that term to be narrower than its ordinary meaning, so that it required a particular form of purposeful entity or association of individuals in fact. To the contrary, much of the discussion during the hearing focused on organized criminal activity—*e.g.*, coordinated frauds and even shoplifting—as the essential evil to which the statute was directed. Second, and relatedly, opponents and some legislators expressed concern that the proposed ORICO statute would not be limited to the larger-scale organized criminal activities that were the legislature's motivating concern. In that regard, the legislative history is particularly telling. It reveals that the legislature drafted the statute aware both that it was not tailored to those larger-scale activities and that its terms did not preclude its use to reach "low level" crimes or smaller-scale coordinated activities that could also be addressed by criminal-conspiracy and habitual-criminal statutes. No drafting solution to that problem was identified. The only solution embraced

was to rely on prosecutors to exercise their charging discretion to serve the legislature's underlying objectives; no legal limit on the statute's reach or the exercise of prosecutorial discretion was made a part of the law.

The legislative history thus reveals a mismatch—or at least, a *potential* mismatch—in the text that the legislature chose for the statute and the policy that the legislature ostensibly sought to effectuate. This court has confronted variations on that general problem in other cases. In *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 724 P2d 788 (1986), for example, the issue was whether the term "watercraft" included pleasure craft as well as commercial vessels. In the absence of any legislative history at all relating to the 1949 enactment of the relevant statute, this court gave the term its ordinary—and expansive—meaning: It applied to all watercraft, including pleasure craft. In doing so, this court explained:

> "Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention. For instance, lawmakers may believe that defining a narrower class for coverage under a statute would cause more problems in interpretation and administration and would be less efficient than to use broad, residual language that avoids such problems. When the express terms of a statute indicate such broader coverage, it is not necessary to show that this was its conscious purpose. In the absence of an affirmative showing that the narrower meaning actually was intended by the drafters, we shall take the legislature at its word ***."

*Id.* at 531 (footnote omitted).

We took the same approach in *Burke v. DLCD*, 352 Or 428, 290 P3d 790 (2012). In that case, we had stronger clues about the legislature's policy objectives because the legislature had made findings indicating that only certain persons were targets of the relevant statute. Because those findings were not reflected in the operative provisions of the law, however, this court gave the statute a broad interpretation

consistent with its text. *See also Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006) (text of statute demonstrated that, "even if the legislature had a particular problem in mind, it chose to use a broader solution"); *Clackamas County v. 102 Marijuana Plants*, 323 Or 680, 688-89, 920 P2d 149 (1996) (where legislative findings pertaining to the legislature's particular reasons for enacting relevant statute were not referred to in operative section of statute, court gave effect to broad language in latter).

The interpretive problem presented here is similar. Although, as discussed above, the legislative history suggests that ORICO was enacted with the objective of curbing larger-scale, more sophisticated or structured criminal activities than those at issue here, textually the statute is not so limited. Moreover, members of the legislature expressly acknowledged the breadth of the statute and the role of prosecutorial discretion in applying it. Particularly where the legislative history demonstrates that the legislature was aware of the expansive nature of an enactment's text, yet chose not to narrow it, we are constrained to interpret the statute in a way that is consistent with that text, which is, in the end, the best indication of the legislature's intent. *See Gaines*, 346 Or at 171 (text and context of legislative enactments remain primary in interpreting their meaning).

This case proves the wisdom of that constraint. When the legislature enacted ORICO, it did so as much in anticipation of future problems of organized criminal activity in the state as to address current ones. The latitude that the legislature left in the statute was deliberate, and the legislature opted to rely on prosecutorial discretion as the means to tailor the statute more precisely to the problems that would be of greatest concern to law enforcement efforts. For us to interpret the statute more restrictively than it was consciously drafted would require us to draw a line that the legislature itself declined to draw. We might succeed in furthering the legislature's objectives better than the legislature itself chose to do; we also might not. Either way, our role is not to draft or revise the laws, or to refine the policy reflected in the law. Our role is to interpret statutes consistently with the words that the legislature used

and the meaning that the legislature understood those words to have, if that meaning is consistent with the words themselves.

Here, the legislative history confirms what the plain text and context convey—that the term "enterprise," consistently with its plain meaning, is an expansive one. It includes casual and informal associations of individuals in fact, as well as organizations with formal structures. An association or entity can be an enterprise within the meaning of ORS 166.715(2) regardless of whether the association or entity has an existence separate from, and independent of, its membership or its activities. The key is whether the association or entity is engaged in ongoing, coordinated criminal activity.

C.  *Federal RICO Cases*

Oregon's ORICO statute, as earlier noted, was modeled on the federal RICO statute.[9] Although federal case law predating the enactment of ORICO therefore can provide useful context for interpreting our statute,[10] no federal

---

[9] The federal RICO statute making racketeering a crime is directed at enterprises affecting interstate commerce, but is otherwise written in terms that closely parallel ORICO. *See* 18 USC § 1962(c) (1976) (unlawful "for any person employed by or associated with an enterprise" affecting interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity"). The federal RICO statute identifying what an enterprise includes is less expressly encompassing than ORICO; for example, it does not expressly include licit and illicit entities, profit and nonprofit entities, or governmental and non-governmental entities. *See* 18 USC § 1961(4) (1976) (enterprise "includes any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). The definition of enterprise in ORICO, while modeled on federal RICO, was "modified somewhat" to clarify the expansive scope of the term and thereby to avoid interpretative issues that were arising in federal courts. *See* Frohnmayer, Arnold, and Hamilton, 18 Willamette L Rev at 6-7 (comparing federal and Oregon definitions of enterprise). Oregon's definition is not, however, inconsistent with federal RICO. Federal courts generally have given the federal definition of enterprise an expansive interpretation consistent with the clarifications that Oregon expressly incorporated. *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co.*, 473 US 479, 499-500, 105 S Ct 3275, 87 L Ed 2d 346 (1985) (enterprise includes illegitimate as well as legitimate businesses); *National Organization for Women, Inc. v. Scheidler*, 510 US 249, 257, 114 S Ct 798, 127 L Ed 2d 99 (1994) (enterprise need not have an economic motivation); *U.S. v. Freeman*, 6 F3d 586, 596-97 (9th Cir 1993) (governmental entity may constitute federal RICO enterprise).

[10] *See State v. Cooper*, 319 Or 162, 168, 874 P2d 822 (1994) (when legislature models Oregon statute after statute from another jurisdiction, legislature

cases—and no United States Supreme Court cases in partic-
ular—had interpreted the meaning of the term "enterprise"
when the legislature drafted, debated, and enacted ORICO.
Cases that came later, however, still may be consulted for
their persuasive value. Because interpretative issues have
arisen under the parallel provisions of federal RICO with
far greater frequency, and in a wider array of factual cir-
cumstances, than under ORICO, we consider it worthwhile
in this case to look to federally controlling Supreme Court
decisions bearing on the meaning of enterprise.

        The first case in which the Supreme Court consid-
ered the meaning of enterprise for purposes of federal RICO
was *United States v. Turkette*, 452 US 576, 101 S Ct 2524,
69 L Ed 2d 246 (1981).[11] The specific issue before the Court
in *Turkette* was whether the term "enterprise" as used in
the federal statute encompassed illegal or illegitimate enter-
prises as well as legitimate ones. The defendant in *Turkette*
had been charged with participating in a wholly criminal
enterprise described in the indictment as a "group of indi-
viduals associated in fact for the purpose of" illegal activi-
ties, including drug trafficking, mail fraud, and bribery. 452
US at 578-79. In resolving whether both illegal and legal
entities were subsumed within the term enterprise, the
Court also explained the way in which the "enterprise" and
"pattern of racketeering activity" elements are interrelated,
but separate:

> "In order to secure a conviction under RICO, the Government
> must prove both the existence of an 'enterprise' and the
> connected 'pattern of racketeering activity.' The enterprise

---

is presumed to have intended same meaning as that given to other statute by
highest court of that jurisdiction).

[11] *Turkette* was decided on June 17, 1981. ORICO was approved by the
Governor on August 21, 1981, and went into effect on November 1, 1981. The
first hearing on the bill took place in April 1981 before the House and Senate
Joint Subcommittee on Organized Crime; other Senate hearings occurred in
May, followed by a hearing in July before the House Judiciary Committee. The
various hearings included frequent mention of the federal RICO statute and its
application; in one instance, a witness informed legislators that federal appellate
courts were in disagreement about the proper meaning of the term "enterprise"
as used in that statute. Tape Recording, Senate Committee on Justice, SB 531,
May 18, 1981, Tape 185, Side A (statement of John Henry Hingson III). Thus, as
discussed in note 9, both before and after *Turkette* was decided, the legislature
generally was aware of developments relating to the federal RICO statute and
drafted ORICO accordingly.

is an entity, for present purposes associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, *formal or informal*, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish th[o]se separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government."

*Turkette*, 452 US at 583 (emphasis added; citation omitted).

*Turkette* made several observations that fit our statute as well. First, the state must prove both the existence of an enterprise and a pattern of racketeering activity. Those are separate elements, and both must be established. Thus, proving a pattern of racketeering activity does not establish, at least not necessarily, the existence of an enterprise. But that does not mean that proof of the two cannot "coalesce." They can, especially when the organization is a group of individuals informally or loosely associated-in-fact, so that proof of the enterprise does not depend on the existence of a particular organizational form or structure, or on certain formalities of structure. For such an informal association, whose animating purpose and reason for existence may be to commit the crimes that form the pattern of racketeering activity, proof of the association-in-fact is particularly likely to coalesce with proof of the pattern of racketeering.

More recent, and more on point with the issue before us in this case, is *Boyle v. United States*, 556 US 938, 1209 S Ct 2237, 173 L Ed 2d 1265 (2009). There, the Supreme Court took up the question of what form or structure an alleged association-in-fact entity must have to qualify as an enterprise for purposes of federal RICO. The Court held that an "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those

associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 US at 946. The Court found the purpose requirement to be implicit in the common meaning of enterprise as a "venture," "undertaking," or "project." *Id*. (quoting *Webster's Third New Int'l Dictionary* 757 (1976)). As for longevity, that feature was inherent in the requirement of participation in a pattern of racketeering activity. *Id*. The Court found no basis in the text of the federal RICO statute, however, for the structural requirements that the defendant in that case proposed, such as a "core membership that functioned as a continuing unit, and an ascertainable structural hierarchy distinct from the charged predicate acts." *Id*. at 943, 948. Rather, the Court affirmed its reasoning in *Turkette* that an "association-in-fact enterprise" was "simply a continuing unit that functions with a common purpose," in which, for example, decisions might be made on an *ad hoc* basis or carried out in a sporadic manner. *Id*. at 948. The Court described the language of the federal statute as "clear but expansive." *Id*. at 950.[12] It also reiterated its observation in *Turkette* that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id*. at 951. The Court therefore found no error in trial court instructions informing the jury that, to prove the element of the existence of an "enterprise," the government was required to prove that there was an "ongoing organization with some sort of framework, formal or informal, for carrying out its

---

[12] As reflected in Supreme Court decisions, the legislative history of federal RICO has presented the Court with the same potential problem that the legislative history of ORICO presents us -- that is, a seeming mismatch between the problem that Congress identified and the breadth of the statute that it enacted to address that problem. As the Court observed in *H.J. Inc v. Northwestern Bell Telephone Co.*, 492 US 229, 245, 109 S Ct 2893, 106 L Ed 2d 195 (1988): "To be sure, Congress focused on, and the examples used in the debates and reports to illustrate the Act's operation concern, the predations of mobsters. Organized crime was without a doubt Congress' major target[.]" Nevertheless, "for cogent reasons," Congress "chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime." *Id*. at 248. Consistently with its recognition that Congress "knew what it was doing when it adopted commodious language capable of extending beyond organized crime," *id*. at 246, the Court has broadly interpreted enterprise and other terms in the statute consistently with Congress's "self-consciously expansive language and overall approach." *Id*. at 249 (quoting *Sedima,* 473 US at 498).

objectives," that "the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose," that an enterprise could consist of "an association of individuals, without structural hierarchy, form[ed] solely for the purpose of carrying out a pattern of racketeering acts," and that "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* at 942, 951 (brackets in original).

Again, as we have noted, the Supreme Court's interpretations of the federal RICO statute are not binding on this court in interpreting ORICO. But the Court's analysis of the text and context of the federal law on which ORICO was modeled parallels our analysis of the text and context of ORICO, and we find the Court's reasoning and conclusions on the meaning of the term "enterprise" persuasive. As we already have concluded from our examination of text, context, and legislative history, an enterprise for purpose of ORICO can be any type of organization or entity, even an informal or loosely organized one, that undertakes some purposeful venture, undertaking, or activity through a pattern of criminal activity. The Supreme Court's view that an enterprise must have a purpose accords with our conclusion. As we have further concluded from ORICO's text and context, an enterprise can be informal or loosely organized in its structure and can derive its existence from the purposeful association itself. That is consistent with the Supreme Court's conclusion that an association-in-fact enterprise must have relationships among those associated with the enterprise, but it need not have a formal structure of any kind; rather, it is enough that it simply be a continuing unit of some kind that functions with a common purpose. The Supreme Court's third structural feature of an association-in-fact enterprise—that the association has longevity sufficient to permit the associates to pursue the enterprise's purpose—also fits with our interpretation, and we embrace it as well. Finally, consistently with those features, we agree with the Supreme Court that an association-in-fact enterprise may consist of an association of individuals, formed "solely for the purpose of carrying out a pattern of racketeering acts," and the existence of an association-in-fact will

often be "more readily proven by what it does, rather than by abstract analysis of its structure." *Boyle,* 556 US at 942.

## III.   APPLICATION TO THIS CASE

The remaining question is whether the facts of this case were sufficient to prove that defendant participated with Williams in an "enterprise" through a pattern of racketeering activity, as ORS 166.720(3) requires. This case provides an apt example of the extent to which proof of an association-in-fact enterprise and proof of a "pattern" of racketeering activity—a pattern of engaging in conduct constituting one or more of the listed crimes—may coalesce.

The state presented evidence of three specific occasions, during a two-month period of time, when defendant and Williams worked together to commit theft. The thefts that they committed had distinctive earmarks. Each of the three thefts were highly coordinated and, a jury could infer, planned in advance. For each of the three thefts, defendant and Williams entered the same Safeway grocery stores, in the same two geographically distant towns (Seaside and Sandy), on the same dates, and at the same times. Although the record is silent about how the two traveled to the Sandy Safeway store, it establishes that defendant and Williams traveled together to the Seaside Safeway. For each of the three thefts, defendant and Williams shopped separately, but they moved about the store in concert. Methodically and in combination, they stole the same distinctive and seemingly incongruous items—in all three instances, they took multiple boxes of disposable diapers, multiple containers of Tide laundry detergent, and multiple cases of beer; in two of the three thefts, they took several large bags of frozen shrimp as well. The planning and organizing behind each crime was apparent from the consistent pattern of the thefts. The thefts were not spontaneous crimes of opportunity, as might occur for teens who, sporadically but repeatedly, steal random items because they see them in the store and, having seen them, want them (*e.g.*, a trendy pair of shoes; a fashionable leather jacket; a status-enhancing watch). The circumstances suggest nothing impulsive or extemporaneous about defendant's and Williams's concerted conduct.

The nature of the merchandise taken, as well, permitted the jury to infer the planned and purposeful nature of the association between defendant and Williams. Expert testimony established that what defendant and Williams took were "high value" and "high theft" items often taken by professional groups of thieves for purposes of resale. Although the state presented no direct proof that defendant and Williams were fencing the items or otherwise using them in trade, the nature and volume of the merchandise readily permitted that inference. Indeed, it is difficult to envision how defendant and Williams personally could use or consume, from the Seaside theft alone, over $1,000 worth of Huggies diapers, Tide detergent, bags of frozen shrimp, and beer.[13]

Moreover, from their collective and common experience, jurors could recognize that stealing over $1,000 of merchandise on a single trip to the grocery store is unusual, at best; when the main items stolen are diapers, laundry detergent, frozen shrimp, and beer, the jury could infer the existence of an organized theft operation of some kind, not just an shoplifting incident by a ordinary (if dishonest) consumer. Add to that the fact that defendant and Williams committed at least two other similar thefts within six weeks of the Seaside theft—ones that involved, again, large volumes of Huggies diapers, Tide detergent, beer, and (and in one of the two additional thefts) frozen shrimp—and the jury could readily infer that defendant and Williams were associated for purposes of committing thefts of items that they could readily sell or otherwise trade for value. As contrasted with defendant's argument to the jury that this was a case of the state inappropriately targeting two individuals who did nothing more sophisticated than commit multiple crimes together, the prosecutor argued:

> "* * * This is a racketeering case. These two individuals are professionals; they know what items they need to get. They know how to do it, and they're hitting the same stores. I

---

[13] Perhaps the jury could have inferred some charitable purpose on defendant's and Williams's part. But even if defendant and Williams were engaged in a coordinated series of thefts "from the rich" so that they could "give to the poor," that purpose still would fit with what qualifies as an enterprise under the statute. *See* ORS 166.715(2) (enterprise includes nonprofit entities).

would argue to you that nobody needs that much shrimp or that many baby diapers or that much beer or that much laundry detergent.

"Using your common sense you know what they're going to do with those items. I would submit to [you], they're selling them."

Both the prosecutor's and defendant's characterization of the evidence, and what inferences the jury should draw, were fair arguments on this record, and it was for the jury to decide which characterization to accept.

We thus agree with the Court of Appeals majority that the evidence gave rise to a question of fact, to be resolved by a jury, as to whether defendant and Williams were participants in an association-in-fact enterprise. As the majority observed, whether conduct "originates from some continuing organizational dynamic" or instead "was merely *ad hoc* or episodic" will often depend on what inference the jury draws from the "multiplicity, similarity, and temporal proximity of criminal acts by recurring combinations or permutations of actors." *Walker*, 252 Or App at 11. In the majority's view, the jury in this case was entitled to infer that the three thefts, "far from being random, sporadic, or isolated," originated from an "overarching, coordinated organizational dynamic and design." *Id.* at 12-13. For the dissent, the evidence in this case reduced to proving nothing more than "episodic activities on multiple occasions." *Id.* at 14 (Edmonds, S. J., dissenting). What was missing from the evidence, the dissent believed, was "some fact from which it could be inferred that defendant and [Williams] were involved in an ongoing criminal business venture of which their thefts were a part—for example, acting together in an organized manner to steal particular merchandise, which, in turn, they could then sell to an available buyer." *Id.* at 15 (Edmonds, S. J., dissenting).

With respect, however, we disagree with the dissent. The relationship between defendant and Williams may have been at the "loosely organized" end of the "associated-in-fact" spectrum. But no *formal* organization or structure was required. From the multiplicity and distinctive similarity of the thefts that defendant and Williams committed,

the jury could find that the criminal conduct in which they engaged was based on a plan or design, that it was purposeful and systematic, and that defendant and Williams had an organized relationship of some longevity, even if it was solely for the purpose of carrying out the racketeering activity. In short, this is a case in which the evidence that permitted the jury to find that defendant engaged in a "pattern of racketeering activity" coalesced to also permit the jury to find that defendant was part of an association-in-fact entity with sufficient purpose, relationship between the participants, and longevity to qualify as an enterprise under ORICO. No formal structure or existence separate from the association's membership was required.

Accordingly, there was sufficient evidence from which the jury could find that defendant was associated with an "enterprise" for the purpose of ORS 166.720(3). The trial court did not err in denying defendant's motion for a judgment of acquittal on the racketeering charge.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.